ROBERT J. McCARTHY v. STATE.

158 N. W. (2d) 708.

May 3, 1968—No. 40,911.

*Douglas M. Head,* Attorney General, and *Laurence A. Anderson,* Special Assistant Attorney General, for appellant.

*Reavill, Neimeyer, Johnson, Fredin & Killen* and *Conrad M. Fredin,* for respondent.

KNUTSON, CHIEF JUSTICE.

The Iron Range Resources and Rehabilitation Commission (hereinafter called IRRC) was created by the legislature some years ago for the purpose of attempting to rehabilitate the northeastern part of Minnesota by encouraging new industry, reviving the industry that had lagged or been phased out, and encouraging the use of depleted or unused natural resources. It consists of three senators appointed by the chairman of the Committee on Committees, three representatives appointed by the speaker of the house, and the acting or present commissioner of conservation, who is automatically an ex officio member.

A commissioner of IRRC is appointed and acts in an administrative capacity. He makes recommendations to IRRC and the commission then has the duty of either approving or rejecting the proposals. It acts in an advisory capacity and its action is not necessarily final, but the commissioner cannot approve projects without submitting them to the commission. A. M. DeYoannes was appointed commissioner of IRRC in February 1961.

Plaintiff, Robert J. McCarthy, is a farmer residing about 16 miles north of Hibbing. Prior to 1961 he was growing and marketing potatoes, selling most of his crop to retail stores in bulk quantities. In 1960 his total acreage was 38 acres.

Due to a change in marketing which resulted from a demand for potatoes that were washed and packaged, McCarthy approached DeYoannes in the spring of 1961 with a proposal to construct a warehouse

on McCarthy's farm which would be equipped to store and handle some 50,000 bushels of potatoes. DeYoannes was interested in the proposal and, while some of the evidence is in dispute as to what happened from that time on, it does sustain the court's findings that the proposal was submitted to the commission and that McCarthy was given assurances that a warehouse would be built in time to handle the 1961 crop of potatoes. He was encouraged to expand his production and did plant and harvest 65 acres of potatoes. When fall came no warehouse had been constructed. McCarthy was at a loss about what to do with his increased production. He put some of the potatoes in the St. Louis County fair grounds, hoping to move them to his farm when the warehouse was completed. November arrived, construction of a warehouse had not yet commenced, and the potatoes were beginning to freeze, necessitating their removal to a heated storage place. McCarthy testified that DeYoannes advised him to move the potatoes and indicated the state would pay him the costs of storing them in a place where they would not freeze. He did move them, and attempted unsuccessfully to market them locally. He finally sold the potatoes to a wholesale brokerage in Chicago.

In 1962 much the same course of events was repeated. McCarthy testified that DeYoannes assured him that this time the warehouse definitely would be completed in time for his harvest and advised him to plant the same acreage as in the previous year, which he did. On April 13, 1962, shortly before the crop had been planted, DeYoannes, acting for the commission, and McCarthy reduced their agreement to a written contract which provided that the state would finance construction of a warehouse, the location of which was now to be in Hibbing. Upon completion, the warehouse was to be rented to McCarthy for 20 years at a total rental of $75,000 and he was to have an option to purchase the property for the amount of the lowest bid received in competitive bidding, subject to some reserved rights on the part of the state.

During the summer of 1962 McCarthy persuaded the commission that his farm would be a more favorable site for the warehouse than Hibbing, so the site was changed accordingly. A designer chosen by McCarthy worked with the state architect in preparing plans for the warehouse.

When fall arrived, there was still no warehouse. As a matter of fact, it was never built. McCarthy again had a crop of potatoes on hand, and DeYoannes advised him to try to sell the crop to the state. McCarthy then entered a bid with the State Purchasing Department, but in view of the fact that he had to include in his bid the cost of hiring a common carrier to transport his potatoes, he was not low bidder. He then bid the potatoes in at cost at his warehouse and received a contract as low bidder, but due to inadequacy of transportation facilities he had difficulty in making delivery.

There are other facts, but those related above are the essentials of what is required to understand the only issue presented here. McCarthy took the matter up with IRRC in an effort to recoup the losses caused by the failure of the commission to construct the warehouse. He was informed that he could receive no relief from IRRC. He then took the matter up with the State Claims Commission and that commission recommended to the legislature that the state's sovereign immunity from suit be waived so that a court action could be brought by McCarthy. The legislature responded by passing L. 1965, c. 495, which, so far as material here, reads:

"Section 1. Subdivision 1. The state of Minnesota hereby waives immunity from suit for damages for injury to person or property or death by the claimants hereinafter named and in an amount not exceeding that hereinafter enumerated. Any such suit shall be commenced within six months from the effective date of this act. *In any such suit the state may interpose any legal or equitable defenses.* The state of Minnesota shall be named as a defendant in any such suit and shall be served by the service of a summons and complaint upon the attorney general." (Italics supplied.)

Thereafter follow five separate claims of individuals based upon various grounds alleged to warrant recovery. Subd. 3 reads:

"Robert J. McCarthy
Star Route 2, Box 70
Hibbing, Minnesota.
"For damages suffered by claimant when Iron Range Resources and

Rehabilitation Commission *failed to comply with its assurances* to build potato warehouse. [$]11,687.00"
(Italics supplied.)

The matter was submitted to the trial court and it found in favor of McCarthy in the sum of $9,303. Part of the claim originally submitted was disallowed. The state has appealed from an order denying its motion for a new trial.

Essentially it is the claim of the state that while the legislature waived the state's sovereign immunity from suit under L. 1965, c. 495, it did not admit liability, and that under § 1, subd. 1, of the act the state could therefore interpose any legal or equitable defenses it had to the claim. It is apparently the state's position that since the assurances given were not fraudulent and did not give rise to a contract, and since assurances are not actionable in the absence of fraud or breach of contract, McCarthy is not entitled to recovery even though he relied to his detriment on the assurances given. The trial court rejected this argument, saying that the legislature, by enacting L. 1965, c. 495, § 1, subd. 3, intended to create a new cause of action for McCarthy.

It is well established that the legislature can, if it sees fit, appropriate money to redress one who is injured, whether the injury gives rise to a legal, or only a moral, obligation. Fuller v. County of Morrison, 36 Minn. 309, 30 N. W. 824. The only question here is what the legislature intended by the language it used. The situation is not unlike that found in Dike v. State, 38 Minn. 366, 38 N. W. 95; Westerson v. State, 207 Minn. 412, 291 N. W. 900; and White v. State, 215 Minn. 609, 11 N. W. (2d) 151, where much the same claims were asserted by the state as we find in the case now before us. In Westerson we find the following (207 Minn. 415, 291 N. W. 902):

"* * * Here, as we have seen, the terms and conditions upon which recovery is founded are stated in the act, and, the complaint being responsive to these, it would seem that liability should follow. We think it is apparent that the legislature intended to compensate for injury done by waiving its sovereign immunity to suit. To hold otherwise would virtually give plaintiff a mere right to sue but leave him with only a non-

existent cause. Such a construction would amount to a total destruction of the obvious beneficent purpose of the act."

The same is true here. If the state's position is correct, the legislature did nothing more than to say, "You may sue the state if you wish, but you cannot recover." We think the language used in § 1, subd. 1, of the act—that any legal and equitable defenses may be interposed by the state—must give way to the specific language of § 1, subd. 3, wherein the legislature surely intended to give McCarthy a right to recover if he could establish that his damages were due to the wrong for which the legislature sought to redress him. In other words, what the language means in plain terms, as we see it, is: "If you can establish that you have been damaged by failure of IRRC to live up to its assurances that it would build this warehouse, then you may recover the amount of damages which you are able to prove resulted from such failure." That is exactly what has been done here. The trial court has found that McCarthy was damaged by failure of IRRC to carry out its assurances and has determined the amount of his damages resulting therefrom. The evidence amply sustains the trial court's findings on these issues. The general rule is that where a statute contains general language and specific terms covering the subject matter thereof, the specific prevails over the general. See, 17 Dunnell, Dig. (3 ed.) § 8970. That rule applies here in that the general language of subd. 1 may have application to some of the claims included within the act but must give way to the specific language of subd. 3.

The state points out that at the same session of the legislature L. 1965, c. 579, was passed, and that § 7, subd. 1, thereof contains this provision:

"The state of Minnesota hereby waives immunity from suit and *admits liability* to the claimants * * *." (Italics supplied.)

It argues that this is an indication that where the legislature intends to admit liability it will say so in the act. We do not think the contention is tenable. Chapter 579 contains a great number of claims recommended for payment by the claims commission. Section 7 deals with damages caused by the creation and maintenance of a reservoir for the storage

of an adequate water supply in Lac qui Parle lake. It is obvious that the legislature recognized the liability of the state for payment of these claims for flooding land despite the absence of an eminent domain proceeding. In other words, it was in effect an eminent domain proceeding after the damage had been done. The state's recognition of the liability was based on the fact that the land included, which is set forth much the same as in an eminent domain proceeding, had actually been damaged. As part of the act it was provided that those who received payment would release the state from claims for further damages and would grant to the state a flowage easement over, across, and upon the lands which had been so damaged. We do not think the provisions of this act cast any light upon the intention of the legislature with respect to the right of McCarthy to recover.

Affirmed.

MR. JUSTICE PETERSON took no part in the consideration or decision of this case.